### Fairfield Sanitary Landfill, Inc. v. Board of Health
*[Cite as 7 AOA 401]*

*Case No. 89AP-757*

*Franklin County, (10th)*
*Decided October 16, 1990*

*William J. Brown, Robert P. Sugarman, and Peter A. Dauzvardis, Emens, Hurd, Kegler & Ritter for Appellee.*

*David L. Landefeld, Fairfield County Prosecuting Attorney, and Roy E. Hart; David E. Northrup, Gurley, Rishel, Myers & Kopech, for Appellant.*

*Anthony J. Celebrezze, Jr., Attorney General, and Mary Kay Smith, for amicus curiae Director of Environmental Protection.*

*Thomas A. Luebbers, Peck, Shaffer & Williams, for amicus curiae County Commissioners Association of Ohio and Association of Ohio Health Commissioners.*

WHITESIDE, J.

Appellee-appellant, Fairfield County District Board of Health ("Board of Health") appeals from a decision of the Environmental Board of Review ("EBR"), which reversed the Board of Health's determination denying appellant-appellee, Fairfield Sanitary Landfill, Inc. ("Fairfield"), an operating license for the year 1989 and raises the following assignments of error:

"1. The Environmental Board of Review erred as a matter of law in holding that a county board of health may not deny an annual operating license for a solid waste facility due to the facility's violations of its permit to install without first consulting with the Ohio Environmental Protection Agency in obtaining that the agency s concurrence that violations justify the denial.

"2. The Environmental Board of Review erred as a matter of law in holding that the question of whether violations of a permit to install by a solid waste facility justified denial of an annual operating license turns in part upon whether the board of health notified the facility of the violations and afforded the facility an opportunity to correct the violations.

"3. The Environmental Board of Review erred as a matter of law in substituting its judgment for that of the board of health as to whether the violations of the permit to install justify denial of the annual operating license.

"4. The Environmental Board of Review committed a clear error of fact in finding that the record lacked evidence of environmental harm and evidence of a threat to public health arising from the violations of the permit to install.

"5. The Environmental Board of Review committed clear error of fact in finding that a field inspector employed by Ohio EPA was aware of and acquiesced in all of the violations of the permit to install committed by the solid waste facility."

Fairfield operates a solid waste facility in Fairfield County. In September 1988, Fairfield submitted an application for its annual operating license to the Board of Health. Following a proposed denial by the Board of Health, Fairfield requested and received an adjudication hearing before a hearing examiner appointed by the Board of Health. The evidence taken at the hearing indicated that Fairfield had not constructed its landfill in strict accordance with the approved plans of its permit to install ("PTI") issued by the Ohio Environmental Protection Agency ("EPA"). The hearing officer determined that, although there were technical violations, they were not substantial enough to warrant license denial. His report and recommendation recommended that the Board of Health issue to Fairfield a 1989 operating license.

The Board of Health, however, disagreed with the hearing officer and formally denied the license, ruling, *inter alia,* that strict compliance with the PTI was required. Fairfield appealed to the EBR, which reversed the Board of Health's decision. The EBR agreed with the hearing officer that, although technical violations had occurred, those violations were not substantial and did not justify denying Fairfield an operating license. Furthermore, the EBR found that an official of the EPA not only knew of Fairfield's changes in construction of the landfill but also informally approved these changes without requiring Fairfield to seek a modifica-

tion of the PTI. Therefore, the EBR concluded that the Board of Health's action was unreasonable and that Fairfield was entitled to a 1989 operating license.

Prior to addressing the Board of Health's assignments of error, we will examine the alleged violations the Board of Health found to warrant denial of the operating license. At all three levels (the hearing officer, the Board of Health, and the EBR), the landfill was separated into four separate areas for consideration of the alleged violations.

In October 1988, the Board of Health hired URS Consultants to conduct a survey of the landfill. Of the four areas depicted in the survey, two of them (areas A and C) were constructed as an area fill, not as a trench fill, as indicated on the approved plans attached to Fairfield's PTI.[1] The elimination of part of the trench walls (which results in a change to area fill) in these two areas was found by the Board of Health not to comply with Fairfield's initial PTI.

In area B, the evidence adduced at the hearing before the hearing examiner showed that the PTI indicated no excavation was to occur either prior to or in connection with the disposal of solid waste. Nevertheless, Fairfield had removed ten to twelve feet of earth in order to remove a "sand lens" from that area. After the sand lens was removed, the area was backfilled with clay and was to be restored to the original elevation prior to the disposal of any solid waste in the area. The last area is a trench fill with the PTI authorizing the trenches to run southwest to northeast. After construction, however, the trenches run northwest to southeast, resulting in a ninety-degree directional difference between the actual trenches and those shown on the plans made part of the PTI. Also, the evidence indicates that some part of the area D trenches are five feet deeper than what was specified, apparently resulting from excavation on one day.

The Board of Health also determined that Fairfield was receiving excess waste between July 25, 1988, and November 14, 1988. The Board of Health cited this as an additional violation justifying license denial.

There are two different standards of review which are relevant to our determination. Initially, in reviewing a determination of a county board of health, the EBR is bound by R.C. 3745.05, which provides in pertinent part:

"If, upon completion of the hearing, the board finds that the action appealed from was lawful and reasonable, it shall make a written order affirming the action,[;] if the board finds that the action was unreasonable or unlawful, it shall make a written order vacating or modifying the action appealed from ***."

In *Citizens Committee v. Williams* (1977), 56 Ohio App. 2d 61, 70, this court defined "unreasonable" as "*** that which is not in accordance with reason, or that which has no factual foundation. ***" The EBR in the present case determined that the Board of Health's action was unreasonable."

R.C. 3745.06 governs review of the EBR decisions by this court and provides in part as follows:

"The court shall affirm the order complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. ***"

Therefore, if the EBR's decision finding that the Board of Health's decision is "unreasonable" is supported by "reliable, probative and substantial evidence," this court must affirm the EBR's determination.

A solid waste facility, such as Fairfield, must obtain an annual operating license prior to the disposing of solid waste. R.C. 3734.05(A), effective December 21, 1988,[2] provides in part:

"*** [N]o person shall operate or maintain a solid waste facility without a license issued by the board of health of the health district in which the facility is located ***." See, also, Ohio Adm. Code 3745-37-01.

Pursuant to Ohio Adm. Code 3745-37-03(A):

"The Board of Health *** shall not issue a solid waste disposal license unless:

"(A) A permit to install, if required by Chapter 3745-31 of the Regulations of the Ohio EPA, has been obtained by the applicant ***."

The requirements for when PTIs must be obtained are contained in Ohio Adm. Code 3745-31-02(A), which provides in pertinent part:

"*** [N]o person shall *** establish or modify a solid waste disposal facility, without first obtaining a permit to install from the director. ***"

In 1988, the applicable definition of "modified" was as follows in Ohio Adm. Code 3745-31-01(I)(2):

"A solid waste disposal facility undergoing:

"***

"(c) An increase of greater than fifty per cent or a minimum of three hundred tons in the average daily waste receipt;

"(d) Or any other substantial alteration of said facility, unless performed in response to the terms of a permit or order of the Ohio EPA."

Therefore, a solid waste disposal license will not be granted by the Board of Health if the PTI, if required, has not yet been obtained by the applicant. Furthermore, if a facility has been "modified" as defined in Ohio Adm. Code 3745-31-01(I), then a PTI is required.

The decision whether to grant a PTI rests solely with the director of the Ohio EPA. See Ohio Adm. Code 3745-31-02 and 3745-27-06. It is only after detailed plans are submitted and reviewed that the director makes a decision. County or district boards of health have neither the discretion nor the authority to make a final determination whether a solid waste disposal facility is required to obtain a PTI since this is the director's province subject to review by the EBR in appropriate cases. Furthermore, if the EPA or the EBR determines that a PTI is not required, a district board of health has no authority to override that decision, substituting its judgment for that of the EPA or EBR, and require the facility to obtain a PTI as a condition of obtaining an operating license. It follows that, if a PTI is not required by the EPA, the failure to obtain one cannot be a proper basis for the Board of Health to deny the facility an operating license.

A solid waste disposal facility, pursuant to R.C. 3734.09, may also be denied a license "*** for violation of any section of this chapter or any rule adopted thereunder. ***" The concept of what constitutes a "violation" that can operate to deny a facility an operating license is closely related to what constitutes a "modification" making it necessary to obtain a new PTI. This is especially true when the alleged "violation" contravenes the PTI to the extent that a "modification" clearly has occurred, requiring a new PTI. However, it follows that, if no new PTI is required by the EPA because there has been no "modification" by the facility, not obtaining a new PTI cannot be a "violation" of the original PTI justifying denial of an annual operating license.

The hearing examiner and the EBR both found that Fairfield had been in substantial compliance with its PTI, even though there were several "deviations" from the PTI. (EBR finding of fact 4.) The EBR throughout its order consistently referred to "deviations" not "violations" of the PTI, and it is correct in that distinction. While a violation is clearly grounds for denial of an operating license, deviations may not be. There is no "modification" unless there is either a "material change" in capacity, topography, depth of excavation, or a "substantial change" in technique or waste receipt.

A solid waste disposal facility may deviate from its approved PTI without necessarily violating it. A substantial compliance, not strict compliance, with the PTI is all that is required. Ohio Adm. Code 3745-37-03(C) provides in part:

"The Board of Health *** shall not issue a solid waste disposal license unless:

"***

"(C) in the case of a previously or currently operating site or facility, the applicant operated a facility in substantial compliance with all applicable provisions *** during the period of effectiveness of the last license held for the facility ***."

PTIs merely establish a minimum standard that must be complied with when operating a solid waste disposal facility. As such, a facility is not prohibited from operating at standards which are above those in the PTI. Therefore, if a "deviation" is above the minimum standards of the PTI, it cannot be a "violation."

The initial problem is that the Board of Health expressly found strict compliance with the PTI to be necessary, which is erroneous. In essence, the EBR determined that the Board of Health's decision denying Fairfield an operating license was unreasonable and without factual foundation. Our review is limited to whether that order is supported by "reliable, probative, and substantial evidence," and we find that it is.

As stated previously, and as the record indicates, Fairfield's facility "deviated" from its approved PTI in four areas. The Board of Health contends that these deviations were significant enough to constitute violations. However, the record supports the EBR's determination that, not only did the EPA informally approve these deviations, but in some instances even suggested them.

Specifically, in areas A and C where area fill was used as opposed to trench fill (which was specified in the PTI), Gerald Jones, a project manager for R. D. Zande and Associates, testified that there is no difference in the

environmental impact when area fill is used instead of trench fill. (Tr. I-147.) Jones also testified as to the reason for this change, as follows:

"An area fill is a design approach which is more commonly applied to large facilities. It's a design that allows itself that makes it easier to install a leachate collection system. With the shift in emphasis I would say nationally with respect to controlling leachate at such facilities, we've seen in the industry in recent years a shift to area fill design." (Tr. I-133.)

Jones further stated that he had spoken with officials of the EPA and that they had been present for on-site inspections and approved of the changes. One of these officials, Duane Snyder, who was in charge of ensuring that the PTI was followed, testified that he along with other EPA officials had observed the change in excavation. Snyder further testified that such a change is *not* a material change and does not create an increased risk of harm to the environment. Moreover, the EPA did not notify anyone of any objection to this change nor otherwise indicate a PTI was required.

In area B, the Board of Health contends Fairfield excavated the area in total violation of its PTI. Jones testified that digging was done in order to remove a "sand lens" which had been discovered while excavating area A. If the sand deposit had been left untouched, Jones testified that it could have acted as a conduit for liquids allowing them to flow into the facility. By removing the sand from the area and then backfilling it with clay, the risk of such liquid seeping into the surrounding fill area was reduced. Furthermore, Jones testified that Fairfield has not used such area for solid waste disposal. Rather, Fairfield plans to fill area B with clay back to its approved elevation prior to disposing of wastes in that area.

The testimony regarding this area not only indicates that it is reasonable to conclude that removal of the sand lens was necessary but that the approved plans of Fairfield's PTI required it to be removed. Miscellaneous note 4 of the approved plans specifically states: "*** Any permeable materials encountered in trench walls during excavation shall be sealed with clay material." Thus, not only was it not a violation for Fairfield to remove the sand and backfill the area with clay, but not doing so arguably would have resulted in a violation.

As for area D, the last area with alleged violations, Snyder, the EPA inspector, testified

that there was a problem with surface water, and as a result he agreed with the change in trench configuration. Snyder, in response to a question by the hearing examiner, stated that he was the EPA representative who was responsible for enforcement of the PTI and that he did not request Fairfield to obtain a new PTI to reflect the change in the configuration.

The EBR's decision that, although Fairfield deviated from its approved PTI, such deviations were not material changes and, thus, did not violate the PTI is supported by a reliable, probative, and substantial evidence as set forth above. The deviations or changes in all areas were known to officials of the Ohio EPA and considered appropriate under the circumstances and informally approved by the Ohio EPA. In essence, the Board of Health was attempting to override the EPA's administrative decision by denying Fairfield an operating license. This type of action by the Board of Health is not proper as decisions of whether a PTI is necessary are solely within the authority of the Ohio EPA. The Board of Health has not demonstrated that the EPA acted either erroneously or in violation of law in giving such informal approval but, instead, has indicated only that the Board of Health disagrees with the informal determination policy of the EPA.

Furthermore, there was significant testimony regarding the impact on the environment of these changes. All of the changes which were made either had no environmental impact or were actually less detrimental for the environment than the original method contemplated by the PTI, such as the removal of the sand from area B. Harm to the environment is clearly the underlying concern, but none was shown by the Board of Health to have occurred here.

In addition to the alleged violations, the Board of Health found that Fairfield had exceeded its maximum daily waste receipt limit. There was evidence produced that showed that the actual daily waste receipts in the average daily intake for the week for the facility from July 25, 1988, through November 14, 1988, were above the limits specified in the Ohio Administrative Code.

Fairfield presented three separate pieces of correspondence from the Ohio EPA to Fairfield regarding the maximum daily waste receipt limit and the average daily waste receipt limit. In a November 20, 1987 letter signed by Snyder, the *average* daily waste receipt limit was set at 3,000 cubic yards per day. On March

14, 1988, another letter, this one signed by Annette DeHavilland, District Engineer with the Ohio EPA, the maximum allowed daily waste receipt for Fairfield was set at 3,750 cubic yards per day. The final correspondence was written by Richard L. Shank, Director of the Ohio EPA, and set a new limit of 3,764 cubic yards per day in accordance with H.B. 592.

By comparing the figures in the charts presented by the Board of Health with the maximum daily limit of 3,750 cubic yards per day set by the Ohio EPA that was in effect during the time in which the chart was kept, it is clear that Fairfield never exceeded it. The highest amount received on any one day occurred during the week of August 1, 1988, and that amount was 3,664 cubic yards per day. Therefore, the Board of Health was clearly erroneous in finding that Fairfield had exceeded its maximum allowed daily waste receipt for the time period of July 25, 1988, through the week of November 14, 1988.

While it is true that, during the seventeen weeks for which records were introduced as evidence, more than 3,000 cubic yards per day was the average daily waste receipt during four of those weeks, H.B. 592 and the new R.C. 3734.05(A) speak of maximum allowed daily waste receipt, not an average limit. Therefore, the EBR's decision that there was no violation in Fairfield's exceeding the average daily limit only four times in seventeen weeks is supported by reliable, probative, and substantial evidence, as well as applicable law.

One of the underlying problems herein is that the Board of Health rejected its own hearing examiner's report and recommendation. In large measure, this was the result of the Board of Health's ignoring the applicable law and rules and applying its own edict of a strict-compliance-with-the-PTI requirement, as a prerequisite to the granting of a license. This was unreasonable and unlawful and alone justifies the EBR's action.

The Board of Health based its conclusion on what it terms in its decision "the relationship between the discretionary language of Revised Code Section 3734.09 and the mandatory language of Revised Code Section 3734.07(A)."

The two sections necessarily complement each other and must be read together, especially since they are enacted by the sane act. R.C. 3734.07(A) states:

"Before a license is initially issued and annually thereafter, or more often if necessary, the board of health *** shall require each solid waste facility *** to be in substantial compliance with this chapter and the rules adopted under it."

On the other hand, R.C. 3734.09 provides that:

"The board of health *** may suspend, revoke, or deny a license for the facility for violation of any section of this chapter or any rule adopted thereunder. ***"

Basically, both sections provide the same, with R.C. 3734.07(A) speaking in terms of the duty of the Board of Health to assure substantial compliance and R.C. 3734.09 speaking in terms of the authority of the Board of Health to take action if there be a violation. However, reading the two sections together, it is clear that there is no violation so long as there is substantial compliance.

The Board of Health received an excellent analysis of the applicable law from its hearing examiner. Unfortunately, the Board of Health rejected this accurate analysis and substituted its own, which was properly found to be unreasonable and unlawful. Findings 1 through 18 of the Board of Health all refer to the deviations and make no factual determination that such deviations were material and no finding that Fairfield was not in substantial compliance with the applicable law, rules, ana the PTI. The only finding suggesting any adverse environmental effect is finding 17, which states "[t]he Fairfield Sanitary Landfill will eventually develop leachate." There is no suggestion, however, that this will occur during or as a result of the 1989 license year.

On the other hand, the EBR specifically found in finding 14 of its order that:

"The record does not present any evidence concerning any environmental harm or the environmental effect resulting from Appellant's deviations from the PTI. Likewise, no evidence was presented demonstrating any threat to public health or public safety as a result of these deviations."

This conclusion of the EBR is fully supported by the record. The word "substantial" essentially means significant or that which has substance or is material or being largely but not wholly that which is required. Thus, a deviation from a requirement is not substantial unless it defeats or undermines some purpose for which the requirement is imposed. A viola-

tion is essentially nonperformance of a duty. As we indicated above, there is no violation if there be substantial compliance which exists in the absence of a material or significant deviation from the requirement whether of law, rule, or the PTI.

Although the EBR did sometimes refer to deviations as violations, it expressly found that they were not substantial, which finding is supported by the evidence. The EBR also found that the EPA had knowledge of the deviations and informally approved them through its agent, Snyder. The Board of Health on the other hand found that Snyder's action was somehow solely his own and not on behalf of the EPA upon some assumption that he had no authority to act. This prompted the EBR finding that the record does not reflect an inquiry of the Board of Health to the Ohio EPA upon which determination of lack of Snyder's authority could be made.

The Board of Health relies heavily upon our decision in *Citizens Committee, supra,* for its attack upon the EBR's findings. In that case, we held at pages 69-70 that the EBR cannot "*** substitute its judgment for that of the director, but is limited to a determination of whether the action taken by the director is unreasonable or unlawful." Furthermore, we defined "unlawful" at page 70 as "*** that which is not in accordance with law ***" and "unreasonable" as "*** that which is not in accordance with reason, or that which has no factual foundation. **" Here, the EBR made findings that the Board of Health erroneously applied the law, acted in a manner not in accordance with reason, and made findings having no factual foundation. We find the EBR correctly interpreted the law and that its factual findings are supported by reliable, probative, and substantial evidence.

Having determined that the EBR's decision that the Board of Health acted unreasonably in denying Fairfield an operating license is supported by reliable, probative, and substantial evidence, we will address each of the Board of Health's assignments of error specifically.

By the first assignment of error, the Board of Health contends that the EBR erred in holding that, as a matter of law, a county board of health must consult with the Ohio EPA prior to denying a facility such as Fairfield an operating license. The Board of Health's statement may be correct; however, it does not accurately reflect the EBR's holding.

First, the EBR correctly determined that Fairfield deviated from but did not violate its PTI. The EBR in no way questioned or limited the Board of Health's authority to deny an operating license if there be actual violations. The hearing examiner in the EBR correctly drew a distinction between deviations and violations as we have set out previously. Where there are only deviations (in other words, where the facility is in substantial compliance with the regulations and Its PTI because the deviations do not constitute a material change), it is for the Ohio EPA to determine whether these deviations are such as to require a modification of the PTI.

There is substantial evidence that the Ohio EPA knew of and informally approved these deviations. The Board of Health does not have the authority to override such a determination by the Ohio EPA. In other words, the facility is entitled to rely upon the EPA's determination of substantial compliance, and the Board of Health has no discretion to review, reverse, or override the EPA determination even though the EPA can later make a different determination. However, where there are actual violations as to which the Ohio EPA has made no determinations, county boards of health have the authority to deny an operating license based on such violations. But where, as here, the evidence showed not only that the Ohio EPA informally assented to Fairfield's deviations but also that the deviations are not material, the Board of Health has no authority to determine otherwise, especially since the evidence indicates no abuse of discretion by the EPA in assenting. Accordingly, the Board of Health's first assignment of error, not correctly reflecting the EBR's holding, is not well-taken.

It follows that the Board of Health's fifth assignment of error is also not well-taken, as we have held that the EBR's decision that the Ohio EPA knew of and approved the deviations from Fairfield's PTI is supported by reliable, probative, and substantial evidence.

By the second assignment of error, the Board of Health contends that the EBR held that, prior to denying Fairfield an operating license, the Board of Health had to give Fairfield an opportunity to correct the alleged violations. The Board of Health bases its contention on the EBR's conclusion of law number 4, which reads:

"An action as drastic as a denial with no opportunity to correct demands *a clear record*

that violations have occurred *which warrant denial."* (Emphasis in original.)

The Board of Health reads this statement as requiring an opportunity to correct every violation prior to denying a facility an operating license. However, the only appropriate interpretation of this statement is that, where a facility is unaware of any violations and is operating in good faith, the record must be clear that violations (not deviations) actually exist which are so serious as to justify license denial, rather than issuance of a license conditional upon correction of the violations.

The evidence supports a finding that the only reasonable conclusion is that Fairfield was operating in good faith without any knowledge of any claimed "violations" and with approval of the Ohio EPA. In other words, Fairfield understood it was operating within the minimum standards set by PTI and, in fact, was. The EBR was correct in holding the Board of Health had to establish a *clear* record of violations prior to denying Fairfield an operating license.

Although the express requirement of R.C. 3734.09 that an opportunity to correct be given applies only to suspensions, modifications, and revocations, logically the same opportunity should be given in the case of renewals. Furthermore, although R.C. 3734.05(A) and 3734.06 refer to an annual license fee and annual license, R.C. 3734.07(A) provides for an annual inspection to determine substantial compliance. R.C. 3734.07(B) requires the board of health issuing the license to certify that the facility is in substantial compliance within thirty days after issuance of the license. There is a distinction between initial denial of a license and refusing to renew a license of an ongoing concern which (except for timing) is difficult to distinguish in effect from a revocation. Accordingly, the Board of Health's second assignment of error is not well-taken.

By the third and fourth assignments of error, the Board of Health makes two contentions regarding factual determinations of the EBR. The Board of Health contends that the EBR incorrectly substituted its judgment for that of the Board of Health in determining the violations did not justify license denial. However, as we held previously, the EBR's finding that the Board of Health's determinations of violations was unreasonable and without factual foundation, is supported by reliable, probative, and substantial evidence.

Furthermore, the Board of Health contends that the EBR erred in holding that the record lacked evidence to show environmental harm. Again, as we held, the EBR's decision that the only reasonable conclusion is that Fairfield's deviations did not have a negative impact on the environment is clearly supported by reliable, probative, and substantial evidence. Accordingly, the Board of Health's third and fourth assignments of error are not well-taken.

Fairfield has filed a motion to dismiss upon the ground that this appeal has become moot. We find no mootness since the operation of the facility continues. The motion to dismiss is overruled.

For the foregoing reasons, all of the Board of Health's assignments of error are overruled, and the order of the Environmental Board of Review is affirmed.

*Order affirmed.*

BRYANT and MARTIN, J.J., concur.

MARTIN, J., of the Fairfield County Court of Common Pleas, sitting by assignment in the Tenth Appellate District.

---

[1] The hearing officer at page seven of his report and recommendation defined area fill and trench fill as follows:

"'Area fill' *** refers to a large area which is excavated for emplacement of solid waste. In contrast, 'trench fill' refers to large, long trenches, in which solid waste is placed. ***"

[2] Throughout this opinion, the references to statutes and regulations are intended to be to those in effect at the pertinent time whether or not specifically indicated.