DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellants, Norton Environmental Company and Steve Viny, appeal from the judgment of the Wayne County Court of Common Pleas which granted summary judgment in favor of Appellee, the State of Ohio. This Court affirms.
 I. {¶ 2} Appellant Norton Environmental Company operates the Mount Eaton Landfill in Wayne County, Ohio. Appellant Steve Viny is the president of Norton Environmental Company (Appellants will be collectively referred to as "NEC"). On October 12, 2001, NEC filed an application with the Ohio *Page 2 
Environmental Protection Agency ("EPA") pursuant to R.C. 3734.05(A)(2) and (4) for a permit to expand the landfill (PTI-02-15841). In December of 2004, NEC learned that two of its employees at the landfill, William Hadley and John Frola, had falsified capacity data in a criminal plot to steal landfill revenues. As a result of their criminal conduct, both employees were indicted and Hadley was convicted of theft. See State v.Hadley, Wayne Cty. C.P. No. 05-CR-0200.
 {¶ 3} NEC's Annual Operational Report for 2004 was due to the Ohio EPA on April 1, 2005. NEC filed its Annual Operational Report for 2004 on March 30, 2005, leaving blank the portion pertaining to "remaining capacity". On April 4, 2005, NEC advised the Ohio EPA that it would voluntarily suspend waste deposits at the Mount Eaton landfill. Shortly thereafter, the Ohio EPA sent a notice of violation/deficiency to Appellant Viny citing violations and deficiencies in NEC's Annual Operational Report for 2004. On April 25, 2005, NEC filed an Amended Annual Operational Report for 2004, listing the "remaining capacity" as zero cubic yards of gross airspace.
 {¶ 4} Upon the request of the Director of the Ohio EPA, on May 1, 2006, the State of Ohio Attorney General ("the State") brought an action for injunctive relief and civil penalties, pursuant to R.C. 3734.10 and R.C. 3734.13(C). In its complaint, the State alleged, among other claims, that the Mount Eaton Landfill exceeded its capacity limits in violation of R.C. 3734.11, failed to provide notice that it had exceeded its waste limits and failed to close the Mount Eaton Landfill *Page 3 
as required by Ohio law. The State sought permanent closure of the landfill. The State twice amended its complaint.
 {¶ 5} On June 16, 2006, the Director of the Ohio EPA issued a notice of proposed denial of NEC's expansion permit on the basis that the Mount Eaton Landfill had exceeded its capacity limits. NEC appealed the Director's proposed denial. The administrative proceeding remains pending. See Ohio EPA Case No. 06-SW-006.
 {¶ 6} On September 28, 2006, the State filed a motion for partial summary judgment alleging that NEC exceeded its waste placement limits, failed to provide notice that it had exceeded its waste limits and failed to close the Mount Eaton Landfill. NEC filed a brief in opposition. On January 27, 2007, the trial court granted summary judgment in favor of the State, finding that there was no genuine issue of material fact regarding the fact that NEC exceeded its waste limits, failed to provide notice and failed to close the Mount Eaton Landfill. NEC timely appealed the trial court's order, raising five assignments of error for our review. We have combined and rearranged NEC's assignments of error to facilitate our review.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN GRANTING SUMMARY JUDGMENT IN FAVOR OF [THE STATE] SINCE, PURSUANT TO R.C. 3734.05(A)(6), EVEN IF THE PENDING PERMIT IS ULTIMATELY DENIED, [NEC] *Page 4 
[HAS] SIX (6) MONTHS TO SUBMIT A CLOSURE PLAN AND ONE (1) YEAR TO COMMENCE FINAL CLOSURE OF THE MOUNT EATON LANDFILL."
 ASSIGNMENT OF ERROR II "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN GRANTING SUMMARY JUDGMENT IN FAVOR OF [THE STATE] SINCE THE DIRECTOR HAS NOT YET TAKEN FINAL ACTION ON THE PENDING PERMIT APPLICATION UNDER R.C. 3734.05(A)(6) AND THE PERTINENT CLOSURE PROVISIONS ARE NOT YET APPLICABLE. THE ADMINISTRATIVE PROCESS IS THE EXCLUSIVE REMEDIAL PROCESS UNDER OHIO LAW AND THE TRIAL COURT LACKED JURISDICTION TO PROCEED UNTIL THE ADMINISTRATIVE PROCESS CONCLUDED."
 ASSIGNMENT OF ERROR III "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN GRANTING SUMMARY JUDGMENT IN FAVOR OF [THE STATE] SINCE THE TRIAL COURT FAILED TO APPLY THE PROPER LEGAL STANDARD. THE APPLICABLE STANDARD IS NOT `STRICT COMPLIANCE' WITH PERMIT CONDITIONS, BUT `SUBSTANTIAL COMPLIANCE.'"
 ASSIGNMENT OF ERROR V "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN GRANTING SUMMARY JUDGMENT IN FAVOR OF [THE STATE] SINCE THERE EXISTED GENUINE ISSUES OF MATERIAL FACT AND [THE STATE] WAS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW."
 {¶ 7} In NEC's first, second, third and fifth assignments of error, it contends that the trial court erred in granting the State's motion for summary judgment because (1) pursuant to R.C. 3734.05(A)(6), even if the pending permit is ultimately denied, NEC has six months to submit a closure plan and one year to commence final closure of the Mount Eaton Landfill, (2) the Director of the Ohio *Page 5 
EPA has not taken final action on NEC's permit application and the pertinent closure provisions are not yet applicable, and (3) the trial court failed to apply the proper legal standard of substantial compliance and (4) the trial court committed prejudicial error in granting summary judgment in favor of the State because genuine issues of material fact remain and the State was not entitled to judgment as a matter of law. We disagree.
 {¶ 8} This Court reviews an award of summary judgment de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial court, viewing the facts of the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. Viock v. Stowe-Woodward Co. (1983),13 Ohio App.3d 7, 12.
 {¶ 9} Pursuant to Civil Rule 56(C), summary judgment is proper if:
 "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. Dresher v. Burt (1996), 75 Ohio St.3d 280, 292-93. Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). Id. *Page 6 
Once this burden is satisfied, the non-moving party bears the burden of offering specific facts to show a genuine issue for trial. Id. at 293. The non-moving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact.Henkle v. Henkle (1991), 75 Ohio App.3d 732, 735.
 {¶ 10} The trial court found that no genuine issue of material fact remained that NEC had (1) exceeded its capacity limits, (2) failed to provide notice that it had exceeded its limits and (3) failed to close the landfill. Several of NEC's assignments of error are intertwined. As such, we will address these arguments together.
Capacity Limits and Mandatory Closure {¶ 11} NEC's threshold arguments on appeal concern the capacity limits of the landfill and its expansion permit. NEC contends that genuine issues of material fact remain regarding the landfill's capacity limits and whether it violated any permit conditions. It argues that the trial court incorrectly determined that the landfill had reached all limits of waste placement. NEC asserts that there were minor over-heights of solid waste placement in some locations but that it had not exceeded its limits in some other areas. NEC contends that most of the overfill is located in the area of the proposed expansion. It argues that its overfill problems will be resolved if the Ohio EPA grants its expansion permit. *Page 7 
 {¶ 12} Pursuant to R.C. 3734.11(A), no person shall violate any section of R.C. Chapter 3734, any rule adopted under it, or any order issued under section 3734.13 of the Revised Code. Similarly, R.C.3734.11(B) provides that "[n]o person who holds a permit or license issued under this chapter shall violate any of the terms and conditions of the permit or license." OAC 3745-27-19(B)(2), adopted under R.C.3734.02, provides that the "operator shall conduct all construction and operation at a sanitary landfill facility in strict compliance with the applicable authorizing documents], including permit[s] to install[.]"
 {¶ 13} OAC 3745-27-11(C) requires "[t]he owner or operator" of a sanitary landfill facility to "begin final closure activities in accordance with the final closure/post-closure plan * * * no later than seven days after" approved limits of solid waste placement have been reached, "as specified in the plan approval, operational report, approved permit(s) to install, or other authorization of the director." See OAC 3745-27-11(C)(2)(b). OAC 3745-27-11(D) requires the owner or operator of a landfill to provide notice to the Director of the Ohio EPA not less than ninety days prior to the anticipated date that the sanitary landfill will cease to accept waste, if final closure will be triggered.
 {¶ 14} The record reflects that in John Frola's February 2006 criminal trial, Viny testified that the landfill was over capacity. In a section entitled "Remaining Capacity as of the end of business on December 31, 2004" in NEC's Amended Annual Operation Report for 2004, filed on April 25, 2005, it reported zero *Page 8 
remaining tons for waste placement, zero years of remaining authorized maximum daily waste receipt (AMDWR) which was measured in tons per day, and zero remaining cubic yards of gross airspace as of December 31, 2004. In a May 16, 2005 letter to the Ohio EPA, NEC's counsel admitted that it had "inadvertently exceeded its permit limits to accept waste." In this same letter, NEC stated that it did not know that it had exceeded its permit limits until late March 2005. Further, NEC acknowledged that it continued to accept and dispose of waste at Mount Eaton Landfill until at least April 4, 2005.
 {¶ 15} On appeal, NEC contends that the calculations it included in its April 2005 Amended Annual Operation Report "were preliminary, conservative estimates and were based on an aerial survey." (Emphasis sic.) NEC asserts that pursuant to the approved volumetric capacity listed on PTI-02-6450 of 1,847,150 cubic yards, the landfill would have excess capacity.
 {¶ 16} First and foremost, the capacity of the landfill to which NEC refers, 1,847,150 cubic yards, appears only in the summary attached to PTI-02-6450. The PTI-02-6450 summary states that it is only provided for "informational purposes and does not constitute a part of, or otherwise affect the attached PTI." PTI-02-6450 does not list the capacity limits in terms of estimated volumetric capacity. More specifically, PTI-02-6450 provides that "[t]he authorized maximum daily waste receipt(AMDWR) remains nine-hundred fifty (950) tons as established by permit to install number 02-716 effective March 12, 1985." (Emphasis added.) *Page 9 
Other than the summary, which specifically states that it is only provided for "informational purposes", there is no other reference in PTI-02-6450 to the capacity of the landfill as 1,847,150 cubic yards. Rather, PTI-02-6450 describes the capacity in terms of tonnage.
 {¶ 17} Secondly, the record reflects that in a November 1, 2006 letter Viny sent to Dr. Susan Buchwalter, President of the Wayne County Board of Health, he implicitly contradicted any assertion that the landfill would have excess capacity. In the letter, Viny stated that "the Director asserts that [NEC] exceeded its final permitted limits of waste placement both vertically and horizontally. As you know, thecircumstances which led to this condition were the result of criminal behavior by the landfill manager, Bill Hadley." (Emphasis added.)
NEC's Subsequent Application for Expansion of Mount Eaton {¶ 18} NEC argues that if in 2002, the Director of the Ohio EPA had issued it a permit to expand its landfill, it would not have exceeded its limits. However, the Director had no obligation to issue NEC a permit to expand. Further, the record reflects that the Director did not issue the permit. Whether or not the Director might have granted NEC's expansion permit has no bearing on NEC's attainment of its permitted limits of waste placement under the permit currently in place, PTI-02-6450. OAC 3745-27-11(C), which governs mandatory closure of landfills, provides no exception to the rule that landfill ownersmust begin closure activities if the landfill has reached its approved limits of solid waste placement. *Page 10 
R.C. 3745.05(AX6) {¶ 19} In 2001, NEC filed an application pursuant to R.C.3745.05(A)(2) and (4) to obtain a modification in the form of an expansion of the Mount Eaton Landfill. NEC contends that pursuant to R.C. 3745.05(A)(6), the Director of the Ohio EPA was required to act upon its application within 180 days after receipt of the application. NEC also asserts that, pursuant to R.C. 3734.05(A)(6), even if its application for a permit to expand is ultimately denied, it has six months to submit a closure plan and one year to commence closure of the landfill. R.C. 3745.05(A)(6) provides, in pertinent part:
 "The director shall act upon an application submitted under division (A)(3) or (4) of this section and any updated engineering plans, specifications, and information submitted under division (A)(5) of this section within one hundred eighty days after receiving them. If the director denies any such permit application, the order denying the application or disapproving the plans shall include the requirements that the owner or operator submit a plan for closure and post-closure care of the facility to the director for approval within six months after issuance of the order, cease accepting solid wastes for disposal or transfer at the facility, and commence closure of the facility not later than one year after issuance of the order."
 {¶ 20} The record reflects that on June 16, 2006, the Director of the Ohio EPA issued a notice of proposed denial of NEC's expansion permit on the basis that the Mount Eaton Landfill had exceeded its capacity limits. NEC appealed the Director's proposed denial and the administrative proceeding remains pending. See Ohio EPA Case No. 06-SW-006. To date, the expansion permit has not been approved. As such, NEC was obligated to comply with the permit under which it *Page 11 
was operating — PTI-02-6450. Whether or not NEC's expansion permit is ultimately approved has no bearing on its obligation to comply with PTI-02-6450 and Ohio environmental laws.
Strict v. Substantial Compliance {¶ 21} NEC contends that the trial court erred in applying the incorrect standard when evaluating its compliance with permit conditions. NEC contends that pursuant to Fairfield Sanitary Landfill,Inc. v. Fairfield Cty. Dist. Bd. of Health (1990), 68 Ohio App.3d 761, a landfill facility must only be in "substantial compliance" with permit conditions and environmental laws, not "strict compliance". The plaintiff in Fairfield, Fairfield Sanitary Landfill, Inc. ("FSL"), operated a solid waste facility in Fairfield County. FSL filed an application for an annual operating license with the Board of Health. Following a proposed denial of the application by the Board of Health, FSL requested a hearing. The hearing officer concluded that FSL had not constructed its landfill in strict compliance with its permit, but nonetheless held that these violations did not amount to a failure to substantially comply with the permit. The Board of Health rejected the hearing officers' findings and denied FSL's application. On appeal, the Tenth District Court of Appeals held that the proper standard was whether the facility was in substantial compliance with permit conditions and environmental laws.
 {¶ 22} Fairfield is distinguishable from this case. The within matter arose from the State's enforcement action based upon NEC's violation of its permit. In *Page 12 
contrast, Fairfield involved the denial of an annual application to operate a sanitary landfill. Immediately following theFairfield court's finding that "substantial compliance, not strict compliance, with the PTI is all that is required", the court cited OAC 3745-37-03(C), which provides that "[t]he Board of Health * * * shall not issue a solid waste disposal license unless * * * the applicant operated a facility in substantial compliance with all applicable provisions * * * during the period of effectiveness of the last license held for the facility." Id. at 669-770. The Fairfield court's reference to "substantial compliance" clearly referred to decisions regarding permit applications or licenses to operate a facility, not violations of permits. Notably, the State concedes that the proper standard for determining whether a permit application or license to operate should be approved or denied is the landfill owner's "substantial compliance" with environmental laws. However, pursuant to OAC 3745-27-19(B), which provides the operational criteria for sanitary landfills:
 "(1) The owner or operator shall conduct all operations at a sanitary landfill facility in strict compliance with the terms and conditions of the solid waste disposal license issued for the facility in accordance with Chapter 3745-37 of the Administrative Code.
 "(2) The owner or operator shall conduct all construction and operation at a sanitary landfill facility in strict compliance with the applicable authorizing document(s), including permit(s) to install, a plan approval, an operational report, an approved final closure plan, an alteration(s) concurred with in writing by Ohio EPA, or any authorizing document(s) listed in paragraph (I) of rule 3745-27-09 of the Administrative Code[.]" (Emphasis added.) *Page 13 
 {¶ 23} A review of Fairfield and the applicable statutory law reveals that "substantial compliance" is only applicable to permit applications and licenses to operate. NEC has failed to demonstrate that this standard applies to evaluations of compliance with permits. Once NEC exceeded its permit limits, it was required to close its facility. The amount by which NEC exceeded its permit limits is not relevant to the matter before us.
No Genuine Issue of Material Fact {¶ 24} Upon review, we find that no genuine issue of material fact remains as to whether NEC exceeded its capacity limits in violation of R.C. 3734.11 and OAC 3745-27-19(B)(2), triggering mandatory closure. The record reflects that NEC repeatedly stated that the landfill was over capacity. Nonetheless, NEC continued to accept and dispose of waste at Mount Eaton Landfill until April 4, 2005, in violation of its permit.
 {¶ 25} We further find no genuine issue of material fact remains regarding the fact that, despite triggering mandatory closure, NEC failed to provide timely notice of its closure as required under OAC 3745-27-11(D) and further, failed to timely close Mount Eaton Landfill as required under OAC 3745-27-11(C). OAC 3745-27-11(D) requires the owner or operator of a landfill to provide notice to the Director of the EPA not less than ninety days prior to the anticipated date that the sanitary landfill will cease to accept waste, if final closure will be triggered. Despite reaching permitted limits of waste some time prior to December 31, 2004, *Page 14 
NEC did not notify the Ohio EPA of its anticipated date of closure until April 4, 2005. This notice fails to comply with the ninety day requirement set forth in OAC 3745-27-11(D).
 {¶ 26} Lastly, we find no genuine issue of material fact remains regarding NEC's failure to timely commence closure activities once it reached its limits of solid waste placement. OAC 3745-27-11(C) requires "[t]he owner or operator" of a sanitary landfill facility to "begin final closure activities in accordance with the final closure/post-closure plan * * * no later than seven days after" approved limits of solid waste placement have been reached, "as specified in the plan approval, operational report, approved permit(s) to install, or other authorization of the director." OAC 3745-27-11(C)(2)(b). The record reflects that NEC continued to accept and dispose of waste at Mount Eaton Landfill until April 4, 2005, well beyond the "seven days after" approved limits of solid waste placement had been reached. NEC clearly failed to timely begin final closure activities as required under OAC 3745-27-11(C).
 {¶ 27} Consequently, NEC's first, second, third and fifth assignments of error are overruled.
 ASSIGNMENT OF ERROR IV "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN GRANTING SUMMARY JUDGMENT IN FAVOR OF [THE STATE] SINCE [NEC] [IS] NOT STRICTLY RESPONSIBLE FOR THE INTERVENING CRIMINAL CONDUCT OF FORMER EMPLOYEES UNDER THE CIRCUMSTANCES[.]" *Page 15 
 {¶ 28} In its fourth assignment of error, NEC contends that the trial court erred in granting summary judgment in favor of the State because NEC is not strictly responsible for the intervening criminal conduct of its former employees. We disagree.
 {¶ 29} We have already determined that no genuine issue of material fact remains as to whether NEC exceeded its permit limits. NEC has failed to provide any specific argument on appeal to establish that any criminal actions of its former employees caused it to exceed its permitted limits of waste capacity. See App.R. 16(A)(7). While NEC's former employees falsified data, which may have contributed to the overage, NEC has not demonstrated the impact this had on its permitted limits. More importantly, NEC has not shown that the criminal conduct of its employees caused it to exceed its capacity limits. Accordingly, we need not consider whether NEC is responsible for the criminal conduct of its former employees. NEC's fourth assignment of error is overruled.
 III. {¶ 30} NEC's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed.
 The Court finds that there were reasonable grounds for this appeal. *Page 16 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27. Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellants.
 WHITMORE, P. J. CARR, J. CONCUR. *Page 1